**In re John R. COLEMAN, Jr., et al.**

**Appeal No. 80–504.**

United States Court of Customs and Patent Appeals.

May 22, 1980.

Rehearing Denied July 10, 1980.

Thomas J. Macpeak, Washington, D. C., attorney of record for appellant; Jack L. Hummell, Littleton, Colo., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents and Trademarks; Fred W. Sherling, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and FORD, Judges.[*]

RICH, Judge.

This appeal is from the decision of the United States Patent and Trademark Office (PTO) Board of Appeals (board) affirming the rejection of claims 1–19 and 21–26 in appellants' application serial No. 412,061, filed November 2, 1973, for "Sulfonation Process," under 35 U.S.C. § 103 as obvious from the teachings of the prior art references. We affirm.

### The Invention

Appellants disclose an improved process for sulfonating hydrocarbon gas oil feedstock with liquid sulfur trioxide ($SO_3$) diluted in ethylene dichloride (EDC). The resulting petroleum sulfonates are allegedly useful for imparting micellar characteristics to mixtures of hydrocarbons and water. Secondary and tertiary oil recovery techniques employ emulsifiers like these sulfonates to increase the yield of "depleted" oil fields. Primary oil recovery techniques using pressure often leave large amounts of crude oil in natural formations. More crude oil can be economically recovered, however, by flooding these formations with micellar formations.

Sulfonates capable of forming a micellar petroleum dispersion must have a proper hydrophil-lipophil balance (HLB). The average equivalent weight[1] of the sulfonate is said to be a major quality control parameter directly related to the HLB. The relative degree of monosulfonation versus polysulfonation is indicated by the equivalent weight. An increasing polysulfonation, represented by a lowering equivalent weight, is stated to be undesirable. A sulfonate equivalent weight less than about 350 is said to adversely influence the micellar properties of the petroleum sulfonate product. A suitable range is 350 to 525 and 375 to 470 is preferred.

Various parameters are alleged to control a monosulfonation reaction. Particular attention is paid to defining the hydrocarbon reactant. The feedstock must have an average molecular weight of broadly about 250 to about 700. The aliphatic to aromatic proton (A/AP) ratio[2] should be between 5 and 50. In addition, the aromatic content is held generally between 30% and 100%.

Liquid $SO_3$, the other reactant, which reacts with the feedstock, must be diluted with EDC prior to a turbulent mixing in order to promote a more even sulfonation. The EDC concentration purportedly is critical. At less than 0.05 lb. $SO_3$/0.35 lb. EDC, the reactant stream becomes a two-phase flow resulting in undesired product. On the upper end, ratios greater than 0.35 allegedly produce sulfonates with unacceptable emulsifying properties.

Some of the claims incorporate an additional temperature limitation.[3] Sulfonate products are maintained within about 100° to about 250° F. after leaving the reaction zone. The specification states that these temperatures are measured in the area "immediately downstream of the reaction zone."

The remaining process steps recited in the claims are conventional prior-art procedures for the neutralization and recovery of petroleum sulfonates.

#### The References

| | | |
|---|---|---|
| Marisic et al. | 2,828,331 | Mar. 25, 1958 |
| Blakeway et al. | 3,346,505 | Oct. 10, 1967 |

Marisic relates to a sulfonation process for petroleum oils, more particularly, lubri-

---

[*] The Honorable Morgan Ford, Judge, United States Customs Court, sitting by designation.

1. Equivalent weight is defined as the molecular weight divided by the average number of sulfonate groups per molecule.

2. The A/AP ratio corresponds to the number of aliphatic protons per number of aromatic protons on the average feedstock molecule.

3. Dependent claim 11 as well as claims 14–26 recite the sulfonate temperature limitation.

cating oils. One of the enunciated objects of the disclosed method is the avoidance of thermal buildups and associated undesirable side reactions, i. e., oxidation and polysulfonation.

Several factors are stated by Marisic to contribute to the formation of suitable sulfonates. Superior yields of high quality sulfonic acids are said to be obtained "by employing turbulent flow conditions within the liquid phase of sulfonatable material present in the reaction zone * * * and assuring a pressure drop of at least about 50 p.s.i.g. between the sulfonating agent [$SO_3$] and sulfonatable material * * *."

In Marisic's summary of sulfonation experiments, Table 1, high treat levels, i. e., weight per cent (wt. %) concentrations, of $SO_3$ are said to be found in examples 1, 6, 8, and 9; respectively, 8.0 wt. %, 5.0 wt. %, 4.6 wt. % and 7.3 wt. %. Concentrations of EDC as an $SO_3$ diluent range from 0.37 lb. of $SO_3$ in Example 6 to 0.66 lb. of $SO_3$ in Example 2, per lb. of EDC. As a further guide to $SO_3$ concentrations, Marisic declares that in devising his process preliminary tests showed that a 15 wt. % $SO_3$ treat produced severe oxidation and polysulfonation to the extent that no recoverable sulfonates were obtained.

Regarding the choice of a hydrocarbon reactant, Marisic relates the following prerequisites. "As long as the sulfonatable material may be caused to flow under turbulent conditions through a reaction zone while mixing with an injected stream of diluted sulfur trioxide-containing sulfonating agent or be brought from a quiescent state to turbulent flow conditions by such injection under the prescribed pressure drop or pressure differential," petroleum sulfonates may be successfully obtained. Thus, sulfonating temperature, reactant ratios, and flow velocities are said to be dependent upon the initial reactants and the desired product determinable by one skilled in the art.

Blakeway, the secondary reference, discloses a co-sulfonation process, for organics of differing volatilities. A less volatile hydrocarbon component is introduced into a reaction zone with vaporized $SO_3$ diluted by an inert gas. A more volatile component is subsequently introduced with an additional amount of diluted $SO_3$ only after the first fraction has been partially sulfonated. As in Marisic, a turbulent mixing site is employed for introducing the hydrocarbons. But a two-stage, in-line reactor is needed instead of the single stage reactor in Marisic.

### The Ossip Affidavit

An affidavit by Paul S. Ossip was submitted to the examiner under 37 CFR 1.132 after a first rejection. Ossip, an admittedly skilled organic chemist, sulfonated Wyoming heavy gas oils[4] in a reactor with $SO_3$ diluted by $N_2$. The pertinent process parameters were averred to have been as follows: a temperature of 104° ± 10°F., at atmospheric pressure, a 15 wt. % $SO_3$ treat level, and a 50% by volume dilution of feedstock with selected solvents.

Following neutralization, a three-phase extraction was performed. The middle phase, containing the desired product but neither the unreacted oil nor unwanted polysulfonates, was analyzed. The table below presents the analytical results:

| Example No. | Solvent for Gas Oil | Percent $SO_3$ Converted to Sulfonate |
|---|---|---|
| 1 | Ethylene dichloride | 56 |
| 2 | Chlorobenzene | 62 |
| 3 | O-dichlorobenzene | 63 |
| 4 | Trichloroethylene | 46 |
| 5 | 1, 1, 2, 2-Tetra-chloroethane | 55 |
| 6 | Nitrobenzene | 54 |
| 7 | 2-Nitropropane | 44 |
| 8 | 1, 2-Dichloropropane | 56 |
| 9 | Cis-1, 2-dichloroethylene | 58 |

Ossip declared that the product of significant, polysulfonation side reactions would partition into the lower phase, thereby low-

4. These oils were stated to have a standard Saybolt Universal viscosity (SSU) of 300 at 130°F., an A/AP ratio of 21, and an average MW of about 425–430. The SUS quantity refers to the efflux time in seconds of 60 ml. of sample flowing through a calibrated Universal orifice in a Saybolt viscometer under specified conditions.

ering the SO$_3$ per cent conversion in the middle phase. The test was held to show that EDC is comparable to other solvents in its promotion of polysulfonation.

### The Board

Characterizing appellants' method as an efficient sulfonation process for producing petroleum emulsifiers, the board held that * * * it would have been *prima facie* obvious to the chemist of ordinary skill to apply the sulfonation conditions of Marisic et al to hydrocarbon oils of the type encompassed by the claims with the expectation that a useful sulfonated emulsifying agent would be produced.

Both appellants and Marisic were said to encounter the problem of unwanted polysulfonation formation.

Appellants achieve their purpose by carefully controlling the sulfonation reaction conditions, specifically the ratio of SO$_3$ to its specific diluent ethylene dichloride (EDC), the ratio of SO$_3$ to the hydrocarbon feed stock, the reaction temperature and to some extent the degree of agitation of the reaction process.

These reaction conditions were found by the board to be "essentially the same" as those disclosed in Marisic for achieving the same result, petroleum monosulfonates.

The materiality of the claimed feedstock limitation was stated to be immaterial to the sulfonation process.

The nature of the feed, while it may affect the emulsifying properties of the product, would not be expected to materially alter or otherwise affect the course of the sulfonation reaction or reaction mechanism involved therein. One of ordinary skill in the sulfonation art would not have any logical reason to believe that the sulfonation process described in the art would not be generally applicable to all hydrocarbon oils, including those specifically claimed herein. Moreover, as indicated by the Examiner, Blakeway et al tend to support the view that hydrocarbon oils within the scope of those claimed would be expected to be subject to general sulfonation reaction conditions.

Particularly noted was the lack of any evidence to distinguish between the product of appellants' process and conventional emulsifying agents.

Finally, the Ossip affidavit was held to be irrelevant to determining the obviousness of the present invention. Attention was specifically drawn to the absence of any indication that the sulfonation of Wyoming oil was performed in accordance with the claims.

In affirming the examiner's rejection, the board described appellants' process parameters as an optimization of a prior art process which achieves expected results, i. e., monosulfonation without significant side reactions. None of the claimed limitations were held to have any significant effect on the sulfonation of hydrocarbons.

### OPINION

At the outset, we note that the claimed invention is an improved process. The disputed obviousness of this method must be determined by comparing, as a whole, steps effecting the present method with those known in the prior art at the time the invention was made, as viewed by one of ordinary skill in the art. Resolution of this contested issue begins with deciding whether the feedstock selection step can be properly considered as a *process* limitation bearing on obviousness.

The solicitor advocates that this court should disregard feedstock criteria when determining the establishment of prima facie obviousness because it is a non-essential feature of the recited process. More particularly, we are asked to treat this limitation as in *In re Kanter*, 55 CCPA 1395, 399 F.2d 249, 158 USPQ 331 (1968), where a specific material was acted upon by a known process in an expected manner. We decline to do so.

Polysulfonation is a known problem in the hydrocarbon sulfonation art. Reacting feedstocks may be uncontrollably sulfonated with more than one SO$_3$ substituent per molecule. These actively occurring side

processes or reactions are known to create tarry, totally unacceptable products if left unchecked. Marisic, for example, coordinated various steps, i. e., turbulence, pressure drop, etc., to alleviate this problem. Certainly the prior art recognizes polysulfonation as an unwanted yet essential *process* feature accompanying monosulfonation processes employing $SO_3$.

Appellants disclose a novel means to effectively control these side processes. Feedstock composition is carefully controlled to attain a specific aliphatic-aromatic balance. By doing so, hydrocarbons reacting under prescribed conditions alleviate the side process problem. Therefore, we hold that the feedstock selection step is a relevant chemical process step to be considered in determining nonobviousness under § 103.

■ The nature of the present feedstock is decidedly different from *Kanter* where the claimed process involved the application of a silicon coating to a steel article. There, a change in the steel crystalline structure to a stable, body-centered cubic orientation, i. e., an "alpha-delta" alloy, purportedly improved the adherence of the coating to the substrate. But as we said in *Kanter,* "The process itself [, not the product thereof,] must satisfy the statutory conditions for patentability." Thus, one may look at a starting material to the extent that it affects the process. In *Kanter,* the different crystalline structure did not actively affect and materially alter the manner in which silicon coated the steel. In contrast to this appeal, no adverse side processes in *Kanter* were effected by material selection.

■ Even though the feedstock limitation was improperly ignored, the board correctly held that the claimed process is prima facie obvious. Blakeway is not necessary for any such showing. Marisic broadly teaches that petroleum and aromatic fractions are sulfonatable materials when turbulently mixed with a 4–10 wt. % liquid $SO_3$ treat diluted with EDC. It is irrelevant that the instant feedstocks are a mixture of aromatic compounds. In the claimed process, specific feedstocks are carved out from known sulfonatable petroleum and aromatic fractions and are treated with $SO_3$ at levels which touch the upper treat limit in Marisic. In addition, the diluent concentrations for $SO_3$ in EDC are overlapped by those of the examples in Marisic. It is the close similarity of all the related process steps as a whole which establishes obviousness here.

Appellants argue that the acknowledged failure of Marisic at 15 wt. % reveals a fundamental difference in appellants' process, feedstock selection does appear to permit operability in the claimed process where the prior art specifically admits failure. However, the claims are not limited to 15 wt. %, but are much broader in scope, i. e., from 0.10 to about 0.20 wt. %, a range which extends into operable prior art values. Even though claims 11 and 14–26 recite an additional temperature limitation, these temperatures are relatively close to the disclosed operating temperatures in Marisic. Therefore, arguments concerning the non-recognition of the role feedstocks play in effecting other known parameters of sulfonation processes are irrelevant to the formulation of a prima facie case. *In re Malagari,* 499 F.2d 1297, 182 USPQ 549 (CCPA 1974).

The Ossip affidavit does not rebut the prima facie obviousness derived from Marisic. We agree with appellants that the Ossip sulfonation was in accordance with the claimed process. Ossip reveals that polysulfonation is controlled at a 15 wt. % $SO_3$ treat, an unexpected result which respect to Marisic. While relevant, this alone is not sufficient for rebuttal. The $SO_3$ treat range in the appealed claims is expressed as a range of treat levels which extends into operable prior art values. Therefore, the sole $SO_3$ treat level of 15 wt. % in Ossip is not commensurate in scope with the claims. Unexpected differences must be shown in the lower claimed treat levels where the foundation for obviousness resides.

The alleged relevance of Ossip in demonstrating the equivalence of EDC as a diluent is based upon a misconstruction of Marisic. The prior art recommendation for discarding liquid-liquid EDC sulfonation involved the use of "wetted wall columns," not the turbulent zone reactors used by Marisic and appellants. As shown in Table II (columns 9 and 10), EDC was used as a $SO_3$ diluent in an operable, turbulent zone sulfonation process. Therefore its use is not unexpected.

Without sufficient relevant evidence to rebut the prima facie obviousness of the present invention as claimed, the rejection of claims 1–19 and 21–26 is *affirmed*

AFFIRMED.